UNITED STATES of America,
Plaintiff-Appellee,

v.

Alex ELMORE, Defendant-Appellant.

No. 78–5304.

United States Court of Appeals,
Fifth Circuit.

May 22, 1979.

P. Bruce Kirwan, Federal Public Defender, Janet F. Perlman, Asst. Federal Public

Defender, Atlanta, Ga., for defendant-appellant.

William L. Harper, U. S. Atty., C. Michael Abbott, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before BROWN, Chief Judge, COLEMAN, and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge.

Convicted after a jury trial of unlawfully possessing a controlled substance, heroin hydrochloride, with intent to distribute in violation of 21 U.S.C. § 841(a)(1), Alex Elmore now argues on appeal that the trial court committed reversible error in denying his motion to suppress. For reasons discussed below, we conclude that the drugs seized from Elmore were not the fruits of an unlawful stop and therefore the District Court properly denied Elmore's suppression motion.

On Saturday, October 8, 1977, Paul J. Markonni and Gerald D. Chapman, special agents of the Drug Enforcement Administration (DEA), were conducting a routine narcotics surveillance at Hartsfield International Airport in Atlanta, Georgia. Both agents had many years experience in the enforcement of federal drug laws.

The agents were positioned between Gates 61 and 63 on Concourse F.[1] Concourse F is the connection between Gates 53–72 and the main terminal area. Gates 67–72 are in a rotunda at the end of Concourse F.

At approximately 5 o'clock p. m., Elmore deplaned at Gate 68 (in the rotunda) from a flight which had originated in Detroit. However, the DEA agents did not see Elmore when he got off the plane. Agents Markonni and Chapman first saw him as he left the rotunda and headed toward the main terminal. He was not carrying any baggage, but the baggage claim level was on a lower floor, with access by stairs or escalator, emanating from the main terminal area.

Elmore was seen walking into and then out of the Gate 66 area. No flights were due to arrive at that gate at that time. He then walked over to a window on the opposite side of the hallway, overlooking a parking area for planes. After looking out of this window he walked through the Gate 65 area. A flight had arrived at Gate 65 a "little bit earlier" and "had just about emptied" of passengers. The agents could not see into these gate areas.

Elmore resumed walking down the concourse in the agents' direction. According to Agent Chapman's testimony, "He looked back several times." Elmore stopped a couple of feet from the agents to examine an electronic flight monitor located in the concourse as well as to examine his ticket. We here observe that there is nothing unusual about a person verifying his flight number when looking for it on a monitor screen. At this point the DEA agents noticed that Elmore did not have any baggage claim receipts attached to his ticket.

Elmore then went to a Delta counter, where he received information concerning a flight from Atlanta to Birmingham. Birmingham is regarded by the DEA as being a heroin "use" city. Agent Chapman, standing in line behind Elmore at the counter, learned that Elmore had flown into Atlanta from Detroit, which is known by the DEA to be a large heroin distribution center.

From the Delta information center, Elmore entered the main terminal and once there proceeded to the Callaway Country Store and then to a card shop. He walked in and out of both stores without making a purchase or stopping for a more specific look at any of the merchandise. In the

---

1. The evidence relating to the agents' position was conflicting. Agent Chapman had testified at the preliminary hearing and, later, at the suppression hearing that he and Markonni positioned themselves between Gates 63 and 65. He also testified at the suppression hearing that the agents were stationed between Gates 61 and 63. The difference between 61–63 and 63–65 in the concourse is of no material moment.

Callaway Country Store, according to Agent Chapman, Elmore once again "looked around sort of behind him."

Finally, Elmore began walking towards Gate 51, from which the Birmingham flight would depart. Before reaching the gate Elmore was observed to have "looked back several times." In fact, Agent Chapman testified that several times Elmore had observed the two DEA agents following him.

Once at Gate 51, Elmore checked in, received his boarding pass, and then took a seat. At this point, the DEA agents decided to question him because "his moves were sort of strange." Agent Chapman identified himself as a federal narcotics agent and asked to see Elmore's ticket. Elmore handed Agent Chapman a one-way ticket from Detroit to Birmingham. This ticket was made out to "E. Gray". Agent Chapman said, "Mr. Gray?" Elmore responded affirmatively.

Elmore then was asked to provide additional identification. He volunteered that his brother-in-law, E. Gray, had purchased the ticket in advance in Birmingham. Elmore had picked the ticket up in Detroit without any identification. Elmore, visibly nervous, also handed Agent Chapman an Alabama driver's license with his correct name on it.

Agent Chapman then knew that "something was wrong." The ticket was not marked *prepaid* and it was contrary to airline policy, Agent Chapman knew, to give out a prepaid ticket without first requiring identification.

Agent Markonni took Elmore's ticket to Delta to check out Elmore's story. Meanwhile, Agent Chapman, in response to Elmore's inquiry, once more explained that he was a federal narcotics agent and that he was engaged in routine narcotics surveillance. Elmore's "whole facial expression changed. He appeared to be extremely nervous at that point." Elmore then informed Agent Chapman that there was a case pending against him for a heroin sale for which he had been arrested about six weeks earlier.

Agent Markonni subsequently returned with a printed history of Elmore's ticket. The day before Elmore had flown to Detroit under the name E. Gray with a one-way ticket purchased with cash in Birmingham. He returned less than 16 hours later on a one-way ticket which was paid for and picked up in Detroit.

Agent Chapman then asked Elmore whether he was carrying narcotics to which Elmore responded in the negative. After being advised of his right to refuse, Elmore consented to be searched. Elmore began undressing in the gate area but at the suggestion of one of the agents, they retired to a private lounge. Heroin was found in Elmore's left sock. Agent Markonni then informed him that he was under arrest. Additional heroin was then found in the right sock.[2] Agent Chapman then advised Elmore of his *Miranda* rights.

Probable cause was found at a preliminary hearing on October 14, 1977. A one-count indictment subsequently was returned charging Elmore with the violation for which he ultimately was convicted. On November 21, 1977, a hearing was held before a United States Magistrate on Elmore's motion to suppress. The magistrate concluded that Elmore was not "seized" within the meaning of the Fourth Amendment until Agent Markonni "removed the airline ticket from Elmore's immediate presence . . . ." Up until that moment, the magistrate observed, the agents did not use force to detain Elmore and there was no evidence "to suggest that Elmore's freedom of movement was impeded in any way." The magistrate further concluded that at the time of the seizure of Elmore, reasonable suspicion existed justifying such "stop" under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The subsequent search of Elmore, during the course of which the drugs in question

---

**2.** There is conflicting testimony in the record as to whether the suspected heroin was first discovered in Elmore's right or left sock. The heroin was found, so it is really immaterial as to whether it was in the right or left sock when first discovered.

were uncovered, was therefore found to be lawful. Accordingly, the magistrate recommended that the suppression motion should be denied. The District Court denied Elmore's motion for a hearing de novo and adopted the magistrate's recommendation.

Following a two-day jury trial Elmore was found guilty and sentenced to ten years in prison to be followed by a special mandatory parole of three years. This appeal followed.

## II.

■ There can be no question that Elmore was seized within the meaning of the Fourth Amendment prior to the formal announcement of arrest. The dispositive question is, when did the seizure take place? At the point when the agents first approached Elmore, identified themselves as federal law enforcement officers, and requested permission to inspect Elmore's ticket there did not exist the requisite quantum of suspicion. Elmore's activities up to that point may have matched several of the "Drug Courier Profile" characteristics [3] but it has been held the Profile is an insufficient basis, *without more*, on which to bottom a lawful investigative stop. *See United States v. Mendenhall*, 6 Cir. 1979, 596 F.2d 706 (1979) (en banc) (probable cause); *United States v. Rico*, 2 Cir. 1979, 594 F.2d 320–324 (1979); *United States v. Ballard*, 5 Cir. 1978, 573 F.2d 913, 916. *See also United States v. Klein*, 5 Cir. 1979, 592 F.2d 909, at 911–912 & n. 3, and cases cited therein.

We shall assume *arguendo* that if the initial contact between the agents and Elmore was also the moment at which Elmore was seized, then the drugs subsequently seized would be regarded as fruits of an unlawful stop, which would require that they be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

On the other hand, if the finding that the seizure did not occur until Agent Markonni removed Elmore's ticket from Elmore's immediate vicinity is correct, then the seizure and all that followed was lawful.

■ Leaving the Profile to one side, at the time Elmore's airline ticket was taken from his presence the agents had determined that Elmore had arrived from an identified "source city". He was not carrying any baggage and no baggage claim checks were attached to his ticket. He was travelling under an assumed name. He exhibited an unusual degree of nervousness. He had provided false responses to the first three questions asked. He first claimed the name "E. Gray" even though that was not his real name. When asked for identification, he realized that the alias would be discovered and attempted to blunt this discovery by offering an explanation, which Agent Chapman knew to be false, of the circumstances under which the one-way ticket from Detroit had been purchased. It would have been a failure of duty had the federal agents not detained Elmore at that point in order to investigate further. *See*

3. A drug courier profile is discussed in *United States v. Ballard*, 5 Cir. 1978, 573 F.2d 913, 914. At the suppression hearing Agent Markonni identified seven "primary characteristics" and four "secondary characteristics" that make up the Markonni drug courier profile. Because of the presence of certain characteristics in the Markonni profile that were not discussed in *Ballard* and, further, because certain characteristics are assigned different weight, in terms of importance, under the Markonni profile than that indicated in *Ballard*, we deem it worthwhile to report the Markonni profile below. The seven primary characteristics are: (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcases; (3) unusual itin-

erary, such as a rapid turnaround time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amounts of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination currency; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.

The secondary characteristics are (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious call-back telephone number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities.

*Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

Upon further investigation the agents learned that Elmore was then under indictment for the sale of heroin. Moreover, he became visibly nervous when Agent Chapman informed him of the purpose of the investigation. Finally, Agent Markonni learned that Elmore had used the same alias, E. Gray, to travel from Birmingham to Detroit the day before and, further, that his turnaround time in Detroit had been extremely short. This is another "principal characteristic" of the "Drug Courier Profile".

On all these facts (Profile or no Profile) the officers had a right to ask Elmore if he would consent to a search.

Lurking in the background, however, as a prelude to all this, is a question as to whether it was lawful for the officers to approach Elmore at all.

The seminal decision on whether a contact between a law enforcement officer and a citizen which does not amount to a technical arrest is nonetheless a Fourth Amendment "seizure" is *Terry v. Ohio, supra,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Although the *Terry* decision did not address the "propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or investigation", *id.* at 19, 88 S.Ct. at 1879 n. 16, subsequent decisions have so extended the *Terry* analysis. *See, e. g., United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (roving border patrol); *Adams v. Williams, supra,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (investigation of informant's tip); *United States v. Brunson,* 5 Cir. 1977, 549 F.2d 348 (headquarters interrogation of

suspect), *cert. denied,* 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107.

In *Terry,* a police officer of considerable experience approached three men he reasonably suspected of "casing a job, a stick-up", identified himself as a police officer and asked for their names. 392 U.S. at 6, 88 S.Ct. 1868. In response the men "mumbled something". *Id.* at 6–7, 88 S.Ct. 1868. The officer then spun Terry around and patted down his outside clothing, finding a pistol in Terry's coat.

The Supreme Court, concerned lest an overly technical distinction between "stop and frisk" and "searches and seizures" could remove the former from the purview of the Fourth Amendment, held that stops "short of something called a 'technical arrest' or a 'full-blown search'" must meet the Fourth Amendment's "reasonableness" requirement. *Id.* at 19–20, 88 S.Ct. at 1879. On the other hand, Mr. Chief Justice Warren, writing for the *Terry* Court, carefully pointed out that "[O]bviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Id.* at 19, 88 S.Ct. at 1879 n. 16. A seizure has occurred "[O]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." *Id.*[4]

Under the facts before the *Terry* Court it was concluded that a seizure for Fourth Amendment purposes first occurred when the police officer initiated physical contact in order to search Terry for weapons. With respect to the preceding contact—when the officer who was "thoroughly suspicious" approached Terry and his companions, identified himself, and requested identification—

---

4. On the other hand, the *Terry* Court spoke in broad terms of the Fourth Amendment's applicability to "all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness. . . . This seems preferable to an approach which attributes too much significance to an overly technical definition of 'search'." 392 U.S. at 18, 88 S.Ct. at 1878 n. 15. It is evident, however, from the language quoted in the text that the

*Terry* Court assumed that not all police-citizen confrontations would be governed by the Fourth Amendment. Rather, the *Terry* Court used "intrusions", in a more narrow sense, as synonymous with "searches and seizures". Thus the *Terry* Court assumed that "no intrusion upon constitutionally protected rights had occurred" when Officer McFadden initially approached Terry and his two companions, identified himself, and requested identification from them. *Id.* at 19, 88 S.Ct. at 1879 n. 16.

the *Terry* Court observed that "[W]e cannot tell with any certainty upon this record whether any 'seizure' took place" and therefore assumed it had not. 392 U.S. at 19, 88 S.Ct. at 1879 n. 16.

Mr. Justice Harlan, in a concurring opinion, observed that a police officer has "the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away . . . ." 392 U.S. at 32–33, 88 S.Ct. at 1885–1886. On the other hand, Mr. Justice Harlan admonished, a law enforcement officer does not have the right "to make a forcible stop" absent "constitutional grounds to insist on an encounter"—"justifiable suspicion". *Id.* Mr. Justice White, also concurring, noted that "[T]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." However he recognized that a *Terry* stop was something more, permissible only under "proper circumstances, such as those in this case . . . ." 392 U.S. at 34, 88 S.Ct. at 1886.

In *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968),[5] a companion case to *Terry*, the record was found to be unclear as to whether a *Terry* "seizure" took place when a police officer approached a suspect, while he was dining in a restaurant, and "told him to come outside", which the suspect did. *Id.* at 63, 88 S.Ct. 1889. The *Sibron* Court observed that there was no indication in the record

whether Sibron accompanied Patrolman Martin outside in submission to a show of force or authority which left him no choice, or whether he went voluntarily in

a spirit of apparent cooperation with the officer's investigation.

392 U.S. at 63, 88 S.Ct. at 1903.

From *Terry* and *Sibron* it is clear that something less than a full scale arrest and search will trigger Fourth Amendment scrutiny. On the other hand, it equally is clear that certain encounters between law enforcement officers and citizens, even for investigative purposes, are not encompassed by the Fourth Amendment.[6] The task of refining, on a case-by-case basis, the distinction between these two classes of encounters of course remains with us.

When an encounter is effected at gunpoint or when there is physical restraint, there can be little question that a seizure has occurred. Any restraint of movement will do. *United States v. Robinson*, 5 Cir. 1976, 535 F.2d 881, 883 & n. 2. Thus, seizures have been found when an encounter is precipitated by a show of authority, such as when a siren was used to pull a motorist over;[7] when a motorist stepped out of his camper, with his hands up, in response to an officer's knock on the camper door;[8] or when under other circumstances it was "apparent . . . that the individual was not free to ignore the officer and proceed on his way."[9]

When, on the other hand, an individual is "free to choose whether to enter or continue an encounter with police and elects to do so," we have held that there is no seizure. *United States v. Brunson*, 5 Cir. 1977, 549 F.2d 348, 357, and cases cited, *cert. denied*, 434 U.S. 842, 98 S.Ct. 140, 54 L.Ed.2d 107. The determination of whether such a freedom of choice exists often requires a "re-

---

5. 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917.

6. Indeed, the "settled principle that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes they have no right to compel them to answer" was noted in *Davis v. Mississippi*, 394 U.S. 721, 727 n. 6, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969).

7. *United States v. Ward*, 9 Cir. 1973, 488 F.2d 162, 168–70 (en banc).

8. *United States v. Almand*, 5 Cir. 1978, 565 F.2d 927, 929, *cert. denied*, —— U.S. ——, 99 S.Ct. 92, 58 L.Ed.2d 116. *See United States v. Carroll*, 5 Cir. 1979, 591 F.2d 1132, 1135.

9. *United States v. Pope*, 6 Cir. 1977, 561 F.2d 663, 668. *See United States v. Lucas*, 1970, 143 U.S.App.D.C. 6, 442 F.2d 728, 729. *See also United States v. McCain*, 5 Cir. 1977, 556 F.2d 253, 255 (*Miranda* custody when individual free to leave only if she left her baggage).

fined judgment",[10] especially when no force, physical restraint, or blatant show of authority is involved. In *Brunson* we held that an individual taken from his home to the stationhouse by five investigators for questioning was "not seized". 549 F.2d at 358. "[T]here was no frisk, no handcuffing, and no physical contact of any kind." 549 F.2d at 358. Moreover, the conduct of the officers as well as comments made by the officers to the individual indicated that "the investigators were careful *not* to restrain Brunson's 'freedom to walk away.'" (emphasis in original) 549 F.2d at 358. *See also Barfield v. Alabama*, 5 Cir. 1977, 552 F.2d 1114, 1118 (no *Miranda* deprivation of "freedom of action in any significant way" when, although suspect told "she could not" leave stationhouse, her departure was unimpeded).

In *United States v. Wylie*, 1977, 186 U.S. App.D.C. 231, 569 F.2d 62, no seizure was found when an individual was subjected to a field interrogation concerning his identity and his activities immediately preceding the encounter.[11] The *Wylie* Court, applying a reasonable man test of "whether the person was 'under a reasonable impression that he [was] not free to leave,'" held that the District Court reasonably concluded that the encounter was a "contact", not governed by the Fourth Amendment, as opposed to a *Terry* stop. *Id.* 186 U.S.App.D.C. at 237, 569 F.2d at 68. It was observed that there was no physical force or contact, the tone of the officer's initial question suggested that the individual was free to leave, and nothing in the individual's response indicated that he thought otherwise.

■ Applying these considerations to the case now before us we conclude that the District Court could have reasonably concluded (as it did) that no seizure occurred until Agent Markonni carried Elmore's ticket away to the Delta counter. The initial

encounter was not precipitated by force. There was no physical contact. The only show of authority occurred when the agents initially approached Elmore and identified themselves as federal law enforcement officers. Such identification is insufficient to convert an encounter, otherwise regarded as outside the purview of the Fourth Amendment, into a *Terry* stop. *See Terry v. Ohio, supra,* 392 U.S. at 19, 88 S.Ct. 1868 n. 16 (initial encounter when officer identified himself not a seizure).

The tone of the conversation as well as the events that ensued also indicates that Elmore was not compelled to continue with the encounter. The DEA's standard operating procedure, upon initial contact with an individual, was to

> identify themselves and request that the people produce identification. We never demand, we always ask, 'Excuse me. Do you have some identification we could take a look at for a second?' Something on that order.

We conclude that Elmore was not seized for purposes within the Fourth Amendment prior to Agent Markonni's removal of the ticket.

Accordingly, we must affirm the judgment of the Court below.

AFFIRMED.

■

---

10. *United States v. Wylie*, 1977, 186 U.S.App. D.C. 231, 237, 569 F.2d 62, 68.

11. *See Coates v. United States*, D.C.Cir.1969, 134 U.S.App.D.C. 97, 100, 413 F.2d 371, 374 (Burger, J.) (no arrest when individuals, fitting

radio description, questioned about activities and requested to produce car registration and driver's license; "duty of every person to cooperate . . . and to respond unless a Fifth Amendment claim is involved").