UNITED STATES of America,
Plaintiff-Appellee,

v.

Carlos HERNANDEZ and Pedro Luis
Pena, Defendants-Appellants.

No. 80–5051.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Feb. 26, 1982.

* Former Fifth Circuit case, Section 9(1) of Public    Law 96–452—October 14, 1980.

Carhart & McGuirk, Coral Gables, Fla., for Hernandez.

Kirk W. Munroe, Coral Gables, Fla., for Pena.

Samuel J. Smargon, Asst. U. S. Atty., Miami, Fla., for the U. S.

Before MILLER,** Judge, and FRANK M. JOHNSON, Jr. and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

Appellants Pedro Pena and Carlos Hernandez were convicted of conspiracy to possess with intent to distribute methaqualone in violation of 21 U.S.C. § 846; possession with intent to distribute methaqualone in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846; possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; possession of an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871. After consideration of the appellants' contentions, we affirm.

### Facts

On August 20, 1979, at approximately 7:00 p. m., United States Customs Patrol Officers Gary Grimm and Allan Westerman while routinely patrolling a marina observed a Wellcraft powerboat with five persons aboard enter Crandon Park Boat Ramp, Key Biscayne, Florida. Grimm noticed that the vessel was riding low in the water and that there was a fishing rod in the hull of the boat. It was the agent's experience that fishermen normally remove rods after they have finished fishing. After the boat docked, three men walked to an auto and departed. A fourth, Hernandez, went to a station wagon equipped with a trailer and brought it back to the vessel. One man, subsequently determined to be Pena, remained on board. Hernandez and Pena then loaded the boat onto the trailer and drove it about 25 feet from the ramp. Agent Grimm testified the two men had difficulty pulling the vessel onto the trailer and that the "bow was a little too heavy to lift."

The agents walked up to the appellants, identified themselves as customs officers and asked where the boat had come from. After conversation in Spanish with Pena, Hernandez answered that they were coming from Cat Cay in the Bahamas. The agents then asked to whom the vessel belonged. Hernandez, again after conversation with Pena in Spanish, said he did not know, that it belonged to a friend of theirs. The agents asked "Could we board your boat? We would like to board your boat and look in your boat." Hernandez, again after consultation with Pena, told the agents to "go right ahead."

Agent Grimm boarded the vessel but found the cabin door padlocked; he then asked Hernandez for a key. Hernandez first talked with Pena in Spanish and then told the agent, "I'll see if I can find it." Hernandez then walked to the front of the car, pulled out some keys, and handed Grimm a key with a key ring. Grimm then placed the key in the lock and opened the lock.

Upon opening the locked cabin doors, a machine gun fell onto Agent Grimm's feet.

---

** The Honorable Jack R. Miller, Judge for the United States Court of Customs and Patent Appeals, sitting by designation.

Inside the cabin was a machine gun pistol, thirteen bales of marijuana and five boxes of methaqualone tablets. A total of four weapons were found on the boat. Both defendants were then arrested.

### Issues Raised on Appeal

Both appellants argue that the stop was illegal and the consent to search was an illegal fruit thereof. Appellant Hernandez also argues that the evidence against him was insufficient to convict on the possession and conspiracy to possess drug charges. Pena argues that hearsay evidence was admitted and that the government failed to prove a weapon admitted into evidence was a machine gun.

### Standing to Assert Fourth Amendment Rights

The government argues that appellants may not assert a fourth amendment claim in this case under the rationale of *Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 427–428, 58 L.Ed.2d 387 (1978). Under *Rakas* a defendant's fourth amendment rights are violated only when the conduct of the search invades an expectation of privacy personal to the defendant. The rationale of *Rakas* was recently reaffirmed by the Supreme Court in *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 2554, 65 L.Ed.2d 619 (1980).

■ The government's argument on this point must fail for several reasons. At the suppression hearings, the government stipulated to the standing of both defendants. Therefore, appellants never presented evidence as to their expectation of privacy in the boat's cabin. It seems likely that appellants may have been able to demonstrate such a legitimate expectation. They had both been on the boat together and were in lawful possession of it. Pena's wife owned the vessel. Additionally, it should be noted that a change of law involving procedural application of the exclusionary rule under the fourth amendment has not been traditionally accorded retroactive application. *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). *Desist v.*

*United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1966); *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Finally, because we hold that the district court was correct when it held that appellants could not prevail on their fourth amendment claim, the standing issue is less crucial. For these reasons, we proceed to the substance of appellants' claim.

### The Stop: Encounter or Seizure

■ The essence of appellants' argument is that the customs officers could not, consistent with the fourth amendment, ask from where the boat was coming. In short, appellants argue that they were seized when the question was asked. We disagree. The critical facts before us are indistinguishable from those in other cases in which no seizure was found. Although the surrounding circumstances here differ from those in previous stop cases, we believe the factual context before us demands the result we reach even more than in cases previously decided. Particularly significant are the proximity of the incident to the border and to foreign shores and the nature and size of the craft.

■ The threshold task in these cases must be the characterization of the contact between the officer and the citizen. Contacts are distinguished by the amount of restraint imposed on the citizen. In an arrest maximum restraint is imposed and probable cause is required before such contact is permitted. The fourth amendment may be implicated when less than a full arrest occurs. As in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a lesser imposition may require only reasonable suspicion on behalf of the officers. Finally, in a mere contact between officers and citizens in which no restraint occurs the fourth amendment is not implicated and the officer need possess no quantum of suspicion to initiate the contact. *United States v. Elmore*, 595 F.2d 1036, 1041–42 (5th Cir. 1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

The contact in *Elmore*, the classic airport stop case, was similar to that here. The agents approached Elmore, identified themselves as law enforcement officers and asked to see Elmore's ticket. The court in *Elmore* held that the fourth amendment was not implicated by that contact. The government insists that the contact here is similar enough to that which occurred in *Elmore* to end the fourth amendment inquiry and eliminate the need for measuring the quantum of suspicion which might exist in this case. Although we recognize differences between these facts and those in *Elmore*, we believe those differences support rather than weaken the conclusion that appellants were not seized.

The Supreme Court's opinion in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), provides the analytical approach for these cases. A court must balance the "intrusion on the individual's fourth amendment interests against its promotion of legitimate governmental interests." 440 U.S. at 654, 99 S.Ct. at 1396. We note that the intrusion in this case, the asking of a question, is certainly less than occurred in *Elmore* in which the court held that the production of an airline ticket was not sufficient intrusion to trigger the fourth amendment. Here only a question was asked. Appellants were not required to produce any documents or accompany the officers to a different location. The officers requested the key to the cabin but only after appellants had consented to the search of the vessel. This action therefore is not relevant in characterizing the nature of the initial stop.

An airport is different from the shore of a bay. The differences, however, do not support appellants' position. An officer-cit-izen contact is much less of an intrusion in the recreational outdoor setting before us here than in the hustle of an airport where citizens often race to keep important appointments. Further, traffic in airports is routed to designated areas for customs checks. On a bay opening to international waters, the need for random roving officer activity is increased as is citizen recognition of the need for such activity and the potential for an officer-citizen contact.

The level of anxiety raised in the citizen can be a gauge of the intrusion. In *Delaware v. Prouse*, the Supreme Court condemned the arbitrary random selection of a vehicle for a license check. The Court was concerned by the intrusion often involved when a vehicle is stopped. The contact is accompanied by a flashing light and siren. A citizen's trip, which may in some cases be an emergency one, is delayed. Anxiety is created in a citizen on the small possibility that some license or insurance infraction has occurred. The instant case presents a different circumstance. Biscayne Bay is about 100 miles from the Bahamas. When a vessel is observed at a point proximate to the border and large enough to have originated its trip outside of the United States, there is a possibility that customs interests are implicated. Balancing this possibility against the minimal intrusion of the simple question asked here, the need of the government to fulfill its customs functions must win out. Under these circumstances, appellants were not seized.

This result supports important governmental interests. We agree with appellants that the customs regulations are important in this case. However, we believe their existence points to a different result than that urged by appellants.[1] They express

---

1. The appellants argue that *Elmore* is distinguishable. First, the setting in which this occurred differed sufficiently from the airport context to require a different result. We address this argument in full in our opinion. Second, because the officers involved here were customs officers, the defendants argue they were legally compelled to stay. 19 U.S.C. § 1581 provides:

    (a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or

important government interest in the enforcement of customs laws. *United States v. Martinez-Fuertes,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). In this case, the officers involved acted in a way which preserved the delicate balance between the concern for intrusion into private citizens' affairs and legitimate needs of government. Their question to the appellants focused immediately on their only legitimate concern at the time, that is, the place of origin of the boat.[2]

The Customs Service must be able to carry on their important Congressionally prescribed duties in areas such as Biscayne Bay with heavy water traffic proximate to foreign shores. To that end, they must be allowed the minimum intrusion of requesting citizens to state the origin of a journey which is obviously terminated in sight of the agents.

Because the contact between the officers and the appellants here involves no fourth amendment violation, that citizen-government contact is not tainted, there is no reason to scrutinize the consent given by the appellants for the search and thus the evidence found as a result thereof was admissible, the district court correctly disposed of this issue below.

### The Sufficiency of the Evidence as to Appellant Hernandez

■ The standard of review on a sufficiency claim has often been stated. It is whether a reasonably-minded jury must have necessarily entertained a reasonable doubt as to appellant's guilt under the evidence presented. The evidence and inferences therefrom are viewed in the light most favorable to the government. *United States v. Ocanas,* 628 F.2d 353 (5th Cir. 1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981). As to conspiracy, the government is not required to prove a co-conspirator had knowledge of all the details of the conspiracy or of each of its members. *United States v. Alvarez,* 625 F.2d 1196 (5th Cir. 1980) (en banc), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).

■ In this case, the government established Hernandez's knowledge of the conspiracy. He was on a vehicle that by his own admission was coming from Cat Cay. When asked if there was a key to the cabin in which the contraband was locked and, upon consultation with Pena in Spanish, Hernandez obtained the cabin key and handed the agent the key to the cabin. Hernandez was the person who backed the trailer up to the vessel. Appellant Pena, whose wife owned the boat, conferred with Hernandez before responding to each query of the customs officers. The jury could have accepted the evidence with all rational inferences in favor of the government and reached the conclusion that Hernandez was not merely translating from Spanish to English but that he knew all the answers to the questions and was merely relating those to co-conspirator Pena in an effort to make their story consistent. Although mere presence in an area where drugs are discovered

---

vehicle, and use all necessary force to compel compliance.

. . . . .

(d) Any vessel or vehicle which, at any authorized place, is directed to come to a stop by any officer of the customs, or is directed to come to a stop by signal made by any vessel employed in the service of the customs and displaying proper insignia, shall come to a stop, and upon failure to comply a vessel or vehicle so directed to come to a stop shall become subject to pursuit and the master, owner, operator, or person in charge thereof shall be liable to a penalty of not more than $5,000 nor less than $1,000.

The appellants argue that under the law they were not free to go, and therefore this was a seizure implicating the fourth amendment. This argument fails because this statute authorizes stops and vessel boardings. Neither occurred here. Further, a seizure occurs when a citizen reasonably believes he is not free to leave. Appellants do not contend they were aware of 19 U.S.C. § 1581 and misinterpreted it as forbidding their refusal to talk to the officers. Their argument is without merit.

2. Because we find appellants were not seized, we need not determine whether the search was justified as a border search, functional equivalent of the border search or an extended border search. *See United States v. Sheikh,* 654 F.2d 1057, 1070 n.16 (5th Cir. 1981).

is insufficient evidence to support a conviction, *United States v. Rojas*, 537 F.2d 216 (5th Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777, more evidence existed here. This court has affirmed convictions in cases in which a large quantity of contraband was transported by a small number of persons in a small vessel over a long distance. *See, e.g., United States v. Alfrey*, 620 F.2d 551 (5th Cir.), *cert. denied*, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980). In such circumstances, a jury could infer that persons on board knew that the contraband was present and sought its importation into the country. Our review of the facts here reveals sufficient evidence to support the verdict.

### Introduction of Receipt for Gun—Hearsay or Not?

Appellant Pena asserts that the trial court committed reversible error by admitting a gun shop receipt for a gun found on the boat. He asserts that the receipt was introduced to prove the truth of the written assertion on the receipt, that Pena bought the pistol from a local gun shop, and was thus inadmissible hearsay.

Neither the purchase of the gun, the consideration given for it, nor even its ownership was in issue. The government introduced the receipt as evidence from which the jury could infer that appellant Pena had knowledge of what was in the cabin in which the gun was found. As a circumstantial link between Pena and the cabin in which the contraband was found, the evidence was not hearsay and was properly introduced at trial.

### The Machine Gun

Finally, appellant Pena asserts the government did not prove that one of the weapons was a machine gun. Nonetheless, Agent Grimm testified that he had been employed by the United States Customs Service for two years and had been with the United States Border Patrol before that. He indicated he had experience with

weapons as a firearms instructor. As such, he identified the exhibit as a machine gun. This was sufficient evidence on which the jury could find that the exhibit was a machine gun.

Because we find the grounds for reversal put forth by appellants to be without merit, the judgments of the district court are

AFFIRMED.