801 F.2d 395
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Appellee,
v.
Edlow Thomas MATTHEWS, Appellant.
 No. 85-5270.
 United States Court of Appeals, Fourth Circuit.
 Submitted Aug. 20, 1986.
Decided Sept. 11, 1986.
 
 Frank A. Rubino, on brief), for appellant.
 Justin W. Williams, United States Attorney, James M. Sullivan, Special Assistant United States Attorney, William G. Otis, Assistant United States Attorney, and Kenneth E. Melson, Assistant United States Attorney, on brief), for appellee.
 E.D.Va.
 AFFIRMED.
 Before HALL, PHILLIPS and SPROUSE, Circuit Judges.
 PER CURIAM:
 
 I.
 
 1
 On his conditional plea of guilty entered pursuant to Rule 11(a)(2), Federal Rules of Criminal Procedure, subsequent to the district court's overruling his motion to suppress certain incriminating evidence, Edlo Thomas Matthews was convicted of possession of cocaine with intent to distribute and of interstate travel in aid of racketeering, offenses under 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 1952, respectively. Matthews timely noted an appeal from the district court's adverse ruling on his motion to suppress. Finding that the facts and legal arguments are adequately presented in the briefs and record, that the decisional process would not be aided significantly by oral argument, and that Matthews' contentions are without merit, we dispense with oral argument pursuant to Rule 34(a), Federal Rules of Appellate Procedure, and Local Rule 34(a), and affirm the district court's order overruling Matthews's motion to suppress.
 
 II.
 
 2
 There are no disputes as to certain basic facts giving rise to Matthews's conviction and this appeal.
 
 
 3
 Matthews arrived at National Airport, in Arlington, Virginia, at mid-morning on April 22, 1985, as a passenger aboard a regularly-scheduled commercial flight originating in Miami, Florida.
 
 
 4
 Agents Art Vogle and John A. Cornille, assigned to the Drug Enforcement Administration's [DEA] Mass Transportation Detail, were that morning engaged in law enforcement efforts to interdict narcotics trafficking by identifying suspected drug couriers using the nation's airlines for transporting their illicit cargoes from narcotics "source" cities, of which Miami is but one, to "use" cities, such as Washington, D.C.
 
 
 5
 Agents Vogle and Cornille "alerted" to Matthews as he deplaned and followed him through the terminal building to the taxi waiting-area at the terminal entrance. The agents' observed bases for alerting to Matthews are immaterial for purposes of this appeal; it is sufficient to note that the agents lacked reasonable suspicion of criminality on Matthews's part for a Terry-stop[1] or probable cause for an arrest, and such issues are not before the court.
 
 
 6
 The agents confronted Matthews in a non-threatening, non-hostile way as he stood outside the terminal entrance, showed him their credentials identifying them as law enforcement officers (the agents were in plain clothes), and asked whether he would be willing to speak with them. Matthews responded affirmatively.
 
 
 7
 The agents asked Matthews whether he had just arrived on a flight from Miami. Matthews truthfully responded that he had.
 
 
 8
 Agent Vogle asked for Matthews's airline ticket, which Matthews readily produced. After examining the ticket, which bore the name "Nick" Matthews, a monicker Matthews used in lieu of his given name, Edlo, Vogle returned Matthews's ticket.
 
 
 9
 Agent Cornille then explained to Matthews that he and Vogle were members of the Mass Transportation Detail of the DEA and asked whether he was carrying any narcotics. Matthews responded that he was not.
 
 
 10
 Agent Cornille next asked Matthews whether "he would consent to me looking in his bag." Matthews's response was to the effect that he was thirsty and wanted a drink of water.
 
 
 11
 Agent Cornille stated that a drinking fountain was inside the terminal building, and he and agent Vogle then walked back in the terminal with Matthews and verbally guided him to a public fountain where Matthews refreshed himself.
 
 
 12
 At this juncture the parties' testimony begins to diverge, both as to the facts and as to their characterizations of the facts.
 
 
 13
 According to Agent Cornille, the following events occurred:
 
 
 14
 Finished drinking the water, I again asked him the same question that I had asked outside the door, "Would you mind if I took a look in your luggage?" And he said, "Come on, lets go." And I said, "There is no need to go anywhere. We can do it right here. This is fine." He said, "No, I've got some. Let's go."
 
 
 15
 ....
 
 
 16
 That answer was "I have got some." I interpreted that to mean narcotics because I had asked him if he was carrying any narcotics and we walked down to our office, ....
 
 
 17
 Special Agent Vogle's recollection of the event corroborated Agent Cornille's testimony:
 
 
 18
 Detective Cornille asked Mr. Matthews if he could take a look in his bag. Mr. Matthews just responded, "Let's go." And Detective Cornille said, "We don't have to go anywhere, we can look through the bag right here." And Mr. Matthews responded, "I have got some. Let's go." And at that point, we walked down to the FAA police station.
 
 
 19
 Appellant Matthews, on the other hand, testified that he felt that he was effectively in the agents' "custody" by the time the water fountain events occurred. He did not feel he was in custody immediately prior thereto, when he handed over his airline ticket upon the agents' request, as his direct testimony discloses:
 
 
 20
 Q. What do you [Matthews] feel would have happened if you would have looked him [Special Agent Vogle] straight in the eyes and said, "No. I won't give you my [driver's] license. No, I won't show you my plane ticket."
 
 
 21
 A. I felt I would have been taken into custody, you know, for not complying.
 
 
 22
 Significantly, although Matthews's testimony hedged that he felt subject to the agents' authority as law enforcement officers, he admitted he did not feel he was in custody immediately prior to his walk to the water fountain. Yet, only a few moments later, with no evidence of record that the agents had changed the atmosphere of the encounter by shifts in their behavior,their tone of voice, their tactics, or otherwise, Matthews asserted that custody had attached:
 
 
 23
 A. I [Matthews] asked them for a drink of water.
 
 
 24
 Q. Okay. After you asked permission--why did you ask them if you could get a drink of water? Why didn't you just walk away from them and go get one if you wanted one?
 
 
 25
 A. Well, I saw only two things happening, either getting tackled or shot.
 
 
 26
 Q. ... Why did you feel you had to ask their permission to get a drink of water?
 
 
 27
 A. Because I felt that I was in custody.
 
 
 28
 From the water fountain the three walked to the FAA police roll call room at National Airport. There a search of Matthews's luggage, which Matthews aided in, disclosed a quantity of cocaine and led to his immediate arrest and, ultimately, to this appeal.
 
 III.
 
 29
 On the preceding facts the district court concluded that Matthews consented to the search of his luggage. That determination is a factual determination that we will not disturb unless the findings are clearly erroneous, United States v. Gooding, 695 F.2d 78, 82 (4th Cir.1982), and we conclude they are not.
 
 
 30
 Clearly, Agents Vogle and Cornille could not, as a matter of law, have reasonably suspected Matthews of criminal conduct solely on the basis of their observations prior to the luggage search.[2] As the record stands before us, had Matthews refused to answer the agents' questions and merely proceeded on his way, the agents would have been legally powerless to stop him. But there is no error in law in the actions they pursued.
 
 
 31
 Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual in a public place, asking him if he is willing to answer some questions pertaining to their official duties, by posing questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution is voluntary answers to such qeustions. Nor would the fact that the officer identifies himself as a law enforcement agent, without more, convert the occasion into a seizure requiring some level of objective justification. The person approached need not answer any questions put to him; rather, he may decline to listen to the question at all and go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention--no seizure within the meaning of the Fourth Amendment--then no constitutional rights have been infringed. Florida v. Royer, 460 U.S. 491, 497-98 (1983).
 
 
 32
 Further, not all seizures must be justified by probable cause to arrest for a crime. Certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime. Terry v. Ohio. 37 Moreover, not every encounter between a police officer and a citizen is an intrusion requiring an objective justification. Sibron v. New York, 392 U.S. 40 (1968).
 
 
 33
 Whether a police citizen encounter is a mere meeting or a constitutionally protected event is dependent upon the operative facts surrounding the occasion.
 
 
 34
 [A] person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.... As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.
 
 
 35
 United States v. Mendenhall, 446 U.S. 544, 553-54 (1980).
 
 
 36
 After carefully reviewing the record on appeal, including the parties' briefs, we discern no clear error in the district court's determination that the initial contact with Matthews was constitutionally permissible, that Matthews was not "seized," and that he consented to a search of his luggage; indeed, it is objectively clear, absent other observable indicia of criminality, that Matthews was perfectly free to exercise his right to discontinue the conversation with Agents Vogle and Cornille, to withhold consent--emphatically, in fact--for a search of his luggage, and to walk away from a mere police-citizen encounter.[4]
 
 
 37
 We have carefully reviewed the record and applicable law as they pertain to Matthews's contentions, and find no reversible error. Accordingly, we affirm the district court's order overruling Matthews's motion to suppress the seized evidence, and we affirm his conviction.
 
 
 38
 AFFIRMED.
 
 
 
 [1]
 Terry v. Ohio, 392 U.S. 1 (1968) (a police officer may approach a person for investigating possibly criminal behavior even though there is no probable cause to make an arrest.)
 
 
 [2]
 Compare Reid v. Georgia, 448 U.S. 438 (1980) (fact that suspect appeared to fit so called "drug courier profile," without more, insufficient foundation for reasonable suspicion of criminal activity; hence, fruits of search suppressed), with United States v. Harrison, 667 F.2d 1158 (4th Cir.) cert denied, 457 U.S. 1121 (1982) (suspect's match with drug courier profile plus overt attempts to elude officers plus officers' observation of a six inch long bulge on suspect's back beneath his jacket combined to produce reasonable and articulable basis for initial stop). Two slightly different, yet complementary, catalogs of the elements of the "drug courier profile" appear in United States v. Elmore, 595 F.2d 1036, 1039 n. 3 (5th Cir.1979), cert. denied, 447 U.S. 910 (1980), and United States v. Ballard, 573 F.2d 913, 914 (5th Cir.1978)
 
 
 [3]
 "[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where lie has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." 392 U.S. at 27
 
 
 [4]
 Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men.... Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation. Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." Terry v. Ohio, 392 U.S. at 13