UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph Edward PULVANO,
Defendant–Appellant.

No. 79–5693.

United States Court of Appeals,
Fifth Circuit.

Nov. 7, 1980.

Dan Alfaro, Corpus Christi, Tex., for defendant–appellant.

William S. Sutton, Janet F. King, Asst. U. S. Attys., Atlanta, Ga., for the U.S.

Before RONEY, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

Appellant was convicted, after a non–jury trial, of possessing cocaine hydrochloride with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Appellant seeks reversal on the grounds that the trial court erred in denying his motion to suppress certain evidence. Appellant asserts that the evidence was obtained in violation of the Fourth Amendment's proscription against unreasonable searches and seizures. We reject appellant's contention and affirm the judgment of the District Court.

Appellant, Joseph Edward Pulvano, was arrested at Atlanta's Hartsfield International Airport for falsely identifying himself to police officers in violation of Georgia law. A search of his person disclosed that he possessed 26.9 grams of what appeared to be cocaine. A subsequent search of appellant's baggage disclosed an additional 212.9 grams of the same substance. Because the facts leading up to and surrounding appellant's arrest and subsequent search are crucial to our analysis of the legal questions presented, we will review them in detail.

At 8:45 a. m. on July 27, 1979, appellant arrived at Atlanta's Hartsfield International Airport on Delta flight 462, a non–stop flight from West Palm Beach, Florida. Appellant was dressed in blue jeans and a wrinkled long–sleeve shirt with his shirt tail hanging out. It was this attire that first brought appellant to the attention of Agent Terry Mathewson and his companion, Special Agent Gerald Chapman, both of whom work for the Drug Enforcement Administration (DEA). Particularly, Agent Mathewson thought appellant's appearance was "disheveled" and not in conformance with that of the other passengers on the flight, most of whom appeared to be businessmen. When appellant exited the airplane he was carrying a small yellow suitcase. Upon entering the concourse, appellant approached a Delta agent and inquired about Delta flight 116 to Newark, New Jersey. As appellant showed his ticket to the Delta agent, Agent Mathewson, who had begun closer observation of appellant, was able to notice that there were no baggage claim checks on the ticket envelope. From there, appellant proceeded to a phone booth and placed a long–distance phone call. Agent Mathewson testified that he had no idea what was said by appellant during that three to four minute call. Thereafter, appellant left that concourse and headed toward the main terminal. Agent Mathewson did not observe appellant after he left the concourse until some fifteen minutes later, when Agent Mathewson saw him at gate 41–42. Appellant's flight to Newark, New Jersey departed from that gate area. At this time, Agent Mathewson saw appellant place a small yellow suitcase in locker number 315, a locker in the immediate vicinity of that gate area. Appellant then checked–in at the gate from which his flight was to leave. Agent Mathewson obtained appellant's ticket from the gate agent and discovered that it was a one–way ticket, purchased for cash, in the name of J. N. Penn. Agent Mathewson continued his investigation by reviewing appellant's flight reservation information in Delta's computer. This disclosed that appellant purchased the ticket twenty–six minutes before flight time and that he left no call–back number at which he could be reached during that time prior to departure.

On the basis of the information known to him then, Agent Mathewson decided that

an interview with appellant was proper. Agent Mathewson testified that this conclusion was based on the fact the information known about appellant corresponded positively with a drug–courier profile developed by the DEA to help agents determine when airport searches should be conducted. The facts that were significant to Agent Mathewson included the following: appellant was flying from West Palm Beach, Florida, a known "source" city, to Newark, New Jersey, a known "use" city; appellant's appearance was unkempt and unlike that of the other passengers on the flight; appellant purchased his ticket for cash shortly before departure and failed to give a call-back telephone number; appellant was traveling with only one small suitcase; and, lastly, appellant made a relatively brief long–distance call upon deplaning.

Having concluded that an interview of appellant was appropriate, Agent Mathewson, now in the company of Detective Jim Burkhalter, waited for appellant between Locker 315 and the gate from which the plane to Newark was to leave. As appellant approached the locker, Agent Mathewson identified himself as a police officer and asked if he would answer a few questions. Appellant said, "Sure." Agent Mathewson asked to see appellant's plane ticket, and appellant gave it to him. Agent Mathewson asked appellant if the name on the ticket, J. N. Penn, was his, and appellant said, "Yes." Agent Mathewson then asked appellant if he had any identification. Appellant produced a Florida driver's license bearing the name Joseph Edward Pulvano. When asked why he had given an incorrect name initially, appellant said simply, "The name on the ticket is Penn." Agent Mathewson then asked if appellant had any luggage with him, and appellant responded negatively. Agent Mathewson then confronted appellant with the fact that he was seen deplaning with a small yellow suitcase and subsequently placing it in locker 315. Agent Mathewson then asked if he could search the suitcase. After some hesitation, appellant handed Agent Mathewson the key to the locker. Agent Mathewson retrieved the suitcase and asked appellant if he would accompany them to a nearby Delta office. Appellant said, "O.K." and followed the two agents to the office. Up to this point in time neither officer had used any force or coercion to obtain appellant's cooperation, nor had they told him he was under arrest or otherwise restrained his freedom of movement.

Once in the Delta office, appellant was informed that he had a right to refuse to allow the search of his person and his suitcase. Agent Mathewson then asked appellant if he would consent to a search of the suitcase. After a series of ambiguous responses, appellant said he would not give his consent. Agent Mathewson then informed appellant that he was seizing the suitcase and would attempt to obtain a warrant to search it. After a pat–down search of appellant's outer clothing from the waist down revealed nothing, appellant was allowed to continue on his journey, without his suitcase.

What proceeded next is not absolutely clear. Apparently, Agent Mathewson had some misgivings about allowing appellant to leave. After some discussion with other agents, it was determined that appellant could be arrested under Georgia law for falsely identifying himself to Agent Mathewson during their initial contact. Thereafter, appellant was arrested and a more thorough search revealed a vial of a white powdery substance having the appearance of cocaine. Appellant then was taken to the DEA office and advised of his *Miranda* rights. He was again asked if he would consent to a search of his suitcase, but also informed that he had a right to refuse to give his consent. Appellant remained silent for two to three minutes and then, pointing to the suitcase, said, "There is cocaine in there, in the suitcase." Thereafter, appellant signed a written consent form giving the agents permission to search the suitcase. Upon making the search, the agents discovered 212.9 grams of cocaine hydrochloride.

Prior to trial, appellant made a motion to suppress the government's evidence on the grounds that it was unconstitutionally

obtained in violation of his Fourth Amendment rights against unreasonable searches and seizures. A suppression hearing was held before a United States Magistrate. Agent Mathewson was the only witness to testify at the hearing. In a lengthy opinion, the Magistrate concluded that (1) the initial questioning of appellant at the locker was not a stop or an arrest under the Fourth Amendment, and, therefore, neither probable cause nor reasonable suspicion were required at that time, (2) the taking of appellant's bag and subsequent questioning in the Delta office was an unconstitutional seizure, unsupported by probable cause, (3) appellant was not prejudiced by this unconstitutional seizure because no evidence of criminality was thereby disclosed, (4) the later arrest of appellant for giving false identification was proper, as supported by probable cause, (5) the subsequent search of appellant in which cocaine was discovered was proper as incident to a lawful arrest, and (6) the search of appellant's suitcase was constitutional, irrespective of the prior illegal seizure, because it was conducted pursuant to appellant's voluntary and knowing consent. The Magistrate recommended that appellant's motion to suppress be denied. The District Court adopted the Magistrate's report and orally denied appellant's motion to suppress. It is the correctness of that ruling that is the basis for this appeal.

Appellant contends that the trial court erred in denying his motion to suppress certain evidence. He asserts that the evidence should have been excluded because it was obtained unconstitutionally, in violation of his Fourth Amendment right to be free from unreasonable governmental searches and seizures. For the reasons set out below, we reject appellant's contention and affirm the District Court's judgment.

We are initially required to determine if and when appellant was seized within the meaning of the Fourth Amendment. It is only at that point that the government must prove there was either probable cause or reasonable suspicion to detain appellant. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In particular, we must determine whether appellant was seized at the time of his initial conversation with Agent Mathewson, when appellant falsely identified himself. We conclude there was no seizure at that time.

In *United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) the Supreme Court decided a "drug courier profile" case similar to that presented here. In that case, DEA Agent Markoni approached the defendant, who matched certain characteristics in the drug courier profile, and asked to see her plane ticket. A subsequent request for identification disclosed that appellant was traveling under a false name. A search of appellant, to which she had consented, resulted in her arrest for possession of heroin. At trial and on appeal appellant sought to have the heroin suppressed on the grounds that it was obtained in violation of her Fourth Amendment rights. The Court rejected appellant's argument, in a divided opinion.

Though the majority in *Mendenhall* agreed that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in the view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." —— U.S. at ——, 100 S.Ct. at 1877, 64 L.Ed.2d at 509, they were unable to agree if, under the facts presented, appellant had been seized. Justice Stewart, writing for the majority, took the position that no seizure had taken place and, therefore, the Fourth Amendment was not implicated. Justice Powell, concurring in the result with the Chief Justice and Justice Blackmun, assumed that a seizure had occurred, but held that it was reasonable under the circumstances. —— U.S. at ——, 100 S.Ct. at 1880, 64 L.Ed.2d at 512–513. That case did not resolve, therefore, whether the initial questioning of citizens by DEA agents, pursuant to a drug courier profile, is a seizure within the meaning of the Fourth Amendment. The Supreme Court's more recent decision in *Reid v. Georgia,* —— U.S. ——, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), left that question equally unresolved.

■ We conclude that the law in this Circuit, as set out in *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979), is that there has been no seizure, within the meaning of the Fourth Amendment, when DEA agents employing a drug courier profile request airline passengers to produce their ticket and some form of identification, so long as the passenger's cooperation is voluntary and not the product of coercion, force, or other use of authority.[1] Applying that standard to the present case, the District Court concluded that prior to the time Agent Mathewson took possession of appellant's suitcase and requested that appellant follow him to the Delta office, there had been no seizure. We agree. Prior to that time, appellant's cooperation was strictly voluntary. Appellant could have refused the agent's request for identification as easily as he agreed to it. There was no evidence that Agent Mathewson used force, threats of force, or other coercive means to obtain appellant's cooperation.

■ At the time appellant lied to Agent Mathewson about his identity, there had been no seizure. From that time until appellant was arrested for giving a false identification, there was probable cause to arrest appellant for violating Georgia Code Section 26–2506.[2]

The fact that appellant was questioned in the Delta office and his suitcase withheld by the DEA agents, prior to his arrest, is of no consequence in our resolution of this case. This is so even in light of the District Court's holding that such questioning was illegal and unsupported by probable cause. We agree with the Magistrate's recommendation, which said:

1. For an excellent review of the law of search and seizure in cases involving the initial questioning of citizens by DEA agents, pursuant to a drug courier profile, *see United States v. Robinson*, 625 F.2d 1211, (5th Cir. 1980). In that opinion Judge Randall reviews Supreme Court decisions as well as a number of decisions of this Court. She concludes, as do we, that until the Supreme Court renders a definitive statement on point, this Court is bound to follow the rule established in *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979).

Though we adhere to the rule established in *Elmore*, we have very serious concern with the practice of routinely stopping and questioning citizens traveling through airports on wholly domestic flights. We are not unmindful of the DEA's difficult task of eliminating drug trafficking in this country, nor the catastrophic results when they are unable to accomplish their objective. Drug abuse poses a serious threat to some of the most valuable assets of our society; namely our children and our families. Nonetheless, there is an equally substantial interest in all citizens in being free from unreasonable government intrusions in their daily lives. It is one of the basic tenets on which this nation was founded and through which we have grown into the world's guiding beacon for the principles of freedom and democracy.

Appellant was initially stopped and questioned because certain of his characteristics corresponded positively with a DEA drug courier profile. Careful review of those characteristics causes this Court serious concern that the use of such profile, without more, could result in the interrogation of honest law–abiding citizens as easily as it could the apprehension of

criminals. The initial factor in determining which passengers to observe is the flight's point of departure and point of destination. Specifically, agents observe flights from what are known as "source" and "use" cities; cities in which there is a high level of drug trafficking. A review of the cases in which this profile has been used, as well as the direct testimony of DEA Agent Mathewson, convinces us of the tragic fact that every major population center in this country has become a home for drug traffickers. It is difficult, therefore, to give that factor much weight. The other factors most significant in determining that appellant fit the drug courier profile were (1) his clothing was unlike that of the other passengers, (2) he made a long distance telephone call, (3) he had only one small suitcase, (4) he chose to fly in the morning, and (5) he purchased his ticket shortly before departure with cash. None of these factors, either individually or as a whole, are suggestive to this Court of criminal conduct. In fact, they are quite consistent with the activities of large numbers of law–abiding citizens. It is the potential for infringing the rights of these citizens that causes us to question the propriety of interrogating individuals on the basis of a drug courier profile.

We nonetheless follow the rule established in *Elmore*.

2. Georgia Code Section 26 -2506 provides:

A person who gives a false name or address to a law enforcement officer in the lawful discharge of his official duties, with the intent of misleading the officer as to his identity is guilty of a misdemeanor.

... the illegality of the initial detention of the defendant in the Delta office did not taint the later arrest and consent to search.[3] The information leading to the subsequent arrest of Pulvano was untainted by the later unlawful detention. Agent Mathewson had probable cause to arrest the defendant for giving a false name to him in violation of Ga.Code Ann. § 26–2056 [sic] before his encounter with Pulvano became an investigatory stop covered by the Fourth Amendment protection.[4]

Appellant's arrest for violating Georgia Code Section 26–2506 was lawful, being supported by probable cause.[5] It is clear, therefore, that the subsequent search of appellant's person which yielded a small vial of cocaine was valid as made pursuant to a lawful arrest. *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427, 440 (1974). With respect to the cocaine discovered at the time appellant was searched, we conclude that the trial court properly denied appellant's motion to suppress.

Appellant's next contention is that his statement that, "There is cocaine in there, in the suitcase," and his consent to the search of that suitcase were not voluntarily given and, therefore, the evidence obtained must be suppressed. To support this contention of involuntariness, appellant points to the facts that (1) he earlier had refused to give consent to the search of his suitcase, (2) he was arrested after being released from the initial questioning, (3) the initial seizure of his suitcase was with the intent to hold it until a search warrant could be obtained, and (4) appellant signed a form giving consent to the search of his suitcase, rather than simply opening it for the agents.[6] Under these circumstances, appellant contends that consent could not have been voluntary. For the following reasons, we find appellant's contention without merit.

 The question of voluntariness is to be determined from the totality of the circumstances, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1972). When, as in a case such as this, the District Court bases its ruling strictly on written evidence and stipulated facts, our review is not limited to the clearly erroneous standard.[7] After making an

---

**3.** Because our resolution of this case does not require us to determine whether the questioning of appellant in Delta's office and the seizure of his suitcase were unconstitutional, we express no opinion on that question.

**4.** Record on Appeal at 59.

**5.** Appellant does not question the constitutionality of the Georgia law under which he was arrested. Therefore, we express no opinion on that point.

Appellant's contentions with respect to his arrest are that it was a pretext arrest and that it was tainted by the unlawful seizure. As we indicated above, there can be no taint because probable cause existed prior to the time of the allegedly illegal seizure. As to appellant's assertion that the arrest was a "pretext," we need only repeat what this Court has indicated clearly in the past:

When an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest. *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973). The fact that the DEA agents sus-

pected appellant of criminal conduct other than that for which he was lawfully arrested, is irrelevant to the legality of that arrest. Nor is it significant that appellant was never charged with the crime for which he was arrested.

**6.** Appellant also argues that his consent was not voluntary because he was not given his *Miranda* warnings after being arrested. This assertion is without merit, because it is contradicted by the testimony of Agent Mathewson that immediately following the arrest Agent Markoni "was talking with Mr. Pulvano, advising him of his rights, his *Miranda* rights or Minando [sic] warning." Supplemental Record on Appeal at 51. The trial court resolved this issue of credibility against the appellant.

**7.** We note that this Court and the Supreme Court have muddied the waters with regard to the proper standard of review. *See, Jurek v. Estelle*, 623 F.2d 929, 956-63 (5th Cir. 1980) (en banc). In *Mendenhall* the Supreme Court vaguely indicates that clearly erroneous is the correct standard. · U.S. at ----, 100 S.Ct. at 1879. Faced with such lack of clarity, we feel bound to follow this Court's most definitive statement that, when the District Court's voluntariness determination is based solely on

independent review of the record, we conclude that appellant's statement and his consent to the search were voluntarily made. There is no suggestion that threats, promises, or coercion were used to obtain appellant's cooperation. Moreover, the statement was made and consent to search given after appellant was read his *Miranda* rights for the second time and advised that he could refuse to consent if he wanted to. The record further indicates that appellant considered his options for two to three minutes before deciding to give his consent. Under these circumstances, the trial court was justified in concluding that appellant gave his consent voluntarily. *United States v. Troutman*, 590 F.2d 604, 606–07 (5th Cir. 1979).

■ The fact that appellant refused to give his consent to the search prior to his arrest, while a factor to be considered in evaluating the voluntariness of his later decision to give consent, is not determinative. One who refuses to cooperate with the police on the grounds that he is constitutionally permitted to do so, may change his mind at some later time and decide to voluntarily cooperate. In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1976), the Supreme Court held that a person who exercised his *Miranda* right to seek assistance of counsel prior to police interrogation could be questioned later, prior to consultation with counsel, as long as (1) he was aware of his continuing right to remain silent at the time he was questioned and (2) the police ceased questioning if requested to do so. The Court said, " . . . the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " 423 U.S. at 104, 96 S.Ct. at 326. Though *Mosley* involved a somewhat different factual situation, we believe the rule established is applicable here. As in *Mosley*, it appears that the DEA agents here went to great lengths to ensure that appellant's rights were protected and that, if he did give his consent, it was done voluntarily. When appellant was first questioned, prior to arrest, he responded to requests for permission to search the suitcase with the equivocal statement, "Do what you have to do." Rather than taking this as consent, the agents repeated that they could carry out the search only if appellant specifically consented. When he refused to consent the matter was dropped. Later, after he was arrested and the *Miranda* warnings read, appellant was asked whether, under the circumstances, he would consent to a search of his suitcase. It was at that point that appellant volunteered "there is cocaine in there, in the suitcase." That statement was not made in response to a question; it was gratuitous. We conclude that it was voluntarily made. Thereafter, appellant considered the situation and decided to consent to the search of his suitcase. He signed a consent form indicating that he was acting voluntarily.[8] We conclude that the rule established in *Mosley* is satisfied.

Similarly, the other factors which appellant points to as precluding a finding of voluntariness, while entitled to consideration, did not require that the trial court find appellant's consent involuntary. Moreover, our independent review of the record leads us to agree with the trial court that consent was voluntary.

transcripts and undisputed facts, we must make an independent review. *Robinson v. Vollert*, 602 F.2d 87, 92 n.8 (5th Cir. 1979); *Nash v. Estelle*, 597 F.2d 513, 518 (5th Cir.) (en banc), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979).

8. We do not attempt to determine why someone in possession of contraband voluntarily cooperates with police officers looking for such contraband. As the Supreme Court said in *Mendenhall, supra*, " . . . the question is not whether respondent acted in her ultimate self-interest [by consenting to the search], but whether she acted voluntarily." —— U.S. at , 100 S.Ct. at 1880, 64 L.Ed.2d at 512–513.

Many believe confession is good for the soul. Certainly man's conscience often controls his conduct. As R. L. Stevenson phrased it:
"There's just one thing I cannot bear,
and that's my conscience."
In Scots, XIV, My Conscience.

In response to appellant's final argument, that the evidence was obtained by way of an illegal seizure and must, therefore, be excluded as the "fruits of the poisonous tree," *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962), we think it fair to say that the fruit here grew not on a poisonous tree. While appellant may find the fruit bitter, it is simply that he tastes the truth of his own misdeeds.

Finding no error, we AFFIRM.