

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00279-CR

———————————————

COLBY NICHOLAS ARNOLD, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 355th District Court
Hood County, Texas
Trial Court No. CR16435

---

Before Sudderth, C.J.; Womack and Walker, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Colby Nicholas Arnold was charged by indictment with one count of fraudulent use or possession of fifty or more items of identifying information; one count of possession of a controlled substance—morphine—in an amount of one gram or more but less than four grams; and one count of possession of a controlled substance—methamphetamine—in an amount of less than one gram. A jury convicted him on all three counts and assessed his punishment at eighty years' imprisonment on the first count, twenty-five years' imprisonment on the second count, and two years' imprisonment on the third count. The trial court sentenced him accordingly. Arnold now appeals the trial court's judgment, arguing in three issues that the trial court erroneously admitted evidence that was seized pursuant to an unlawful search. Because the complained-of search and seizure were lawful, we will affirm.

## II. BACKGROUND

Prior to trial, Arnold filed a motion to suppress,[1] and the trial court held a hearing on the motion. Because all the testimony pertinent to our resolution of

---

[1] In his motion, Arnold did not allege any specific facts as grounds for suppressing the evidence against him, but he did allege that "[t]he actions of the Granbury Police Department violated [his] constitutional and statutory rights" and that "[a]ny tangible evidence seized in connection with this case . . . was seized without warrant, probable cause[,] or other lawful authority . . . pursuant to the

2

Arnold's appellate issues was received by the trial court at that hearing, we limit our summation of the background facts of Arnold's case to the evidence at the hearing.

## A. Testimony at the Suppression Hearing

Officer Patrick Wilson with the Granbury Police Department testified that on March 3, 2024, he was dispatched to a residential address in Granbury[2] to investigate the theft of a cell phone. According to Officer Wilson, the residents at that address "kept trying to shift blame to the neighbor, [Arnold,] saying that it was probably him." Detective Richard Branum went next door to speak with Arnold. Officer Wilson testified that, as he walked up, Detective Branum "was visiting with them"[3] and that Arnold's mother "granted consent to . . . enter [a] shed." On cross-examination, he testified that he believed that Arnold's mother owned the outbuilding[4] "based [on the fact] that she granted consent."

Detective Branum testified that the owner of the residence to which police had been dispatched "kept telling [the police] that the phone [wa]s probably next door,

---

Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution [and] Article I, Sections 9, 10[,] and 19 of the Constitution of the State of Texas."

[2]Although the record contains the specific address, we omit such sensitive data from our opinion. *See* Tex. R. App. P. 9.10(a)(3).

[3]From the context of the record, it appears that by "them," Officer Wilson meant Arnold and his mother.

[4]Throughout the record, both parties referred to the structure that was eventually—and, according to Arnold, unlawfully—searched as a "shed" and an "outbuilding" interchangeably.

that the person that lived over there was a tech guy and that was what he was into, you know, he was into computers . . . and phones, so [the police] should probably check over there." Based on that, Detective Branum testified, "once we kind of slowed down and w[ere] wrapping up everything at [the residence], I went next door . . and knocked on the door." He witnessed a man identified as Arnold exit a shed on the property. Detective Branum informed Arnold that he was investigating the theft of a cell phone. According to Detective Branum, Arnold "said he understood, and he made the comment that, 'I have a lot of phones. I'll show a couple of them to you, but let me go get my mom. This is her property.'" Detective Branum claimed that "the fact that [Arnold] said, [']I have a bunch but I'll show you a few,['] kind of just made it a little suspicious."

Arnold then went and brought his mother out from the residence. While Detective Branum was informing Arnold's mother why the police were there, Arnold "was back and forth out of house, out of the shed." He testified that Arnold's mother "pretty much gave [him] consent to search whatever [the police] wanted to on the residence. She began opening up shed doors that were locked," but he "told her at that time that wouldn't be necessary[; he] was really interested in the area where her son had been in and out of." Detective Branum testified that Arnold's mother told him that that shed was Arnold's "office[-]type deal" and "was kind of evasive about exactly what the shed was being used for." Detective Branum testified that he then asked Arnold, "Hey, can we go in there and take a look in that shed?" and Arnold's

4

response was "Well, that's my mother's property, so you'll have to talk to her," at which time Detective Branum asked Arnold's mother for her consent again, and she said, "Yeah, that's fine." Arnold then led Detective Branum into the shed.

Detective Branum testified that, as he entered the shed, he initially saw "a checkered-looking fanny pack that was open with some tools and other things in it, and sticking out of the top of it was a used meth pipe or a glass pipe used to smoke methamphetamine." Detective Branum stated that he then went around a corner and saw a small office area with computers running and a "roll-up desk." On the desk, he saw a woman's wallet with a badge holder clipped on it. He stated he also saw an ID on top of the badge holder that did not belong to anyone at the scene. Detective Branum stated he then "picked it up and flipped it over" and saw another ID that belonged to an elderly male who was not at the scene either. He testified that he also saw a whiteboard that had notes consistent with identity theft or fraud written on it.

After observing the pipe, IDs, and the notes on the whiteboard in plain view, Detective Branum asked Arnold "to sign a consent to search and, like, actually allow [the police] to search the property." Arnold declined and was placed under arrest for possession of the meth pipe and the drugs that were in it. The police then applied for a search warrant for Arnold's residence.[5] During the search of Arnold's property,

---

[5]At some point, Detective Branum applied for a second search warrant. He testified that the first search warrant "was for drugs and identifying information."

5

officers found "an enormous amount of identifying information from other individuals."

On cross-examination, when asked, "So whenever you sought consent to enter this building from Ms. Arnold and Mr. Arnold, it was for this red iPhone. Correct?" Detective Branum responded in the affirmative. He described the object that he had picked up and examined in the shed as "a wallet, but there was, like, . . . a clear badge holder connected to it, and it had an ID that was visible that didn't belong [to anybody who] was at the residence." Detective Branum admitted that there was nothing that was immediately apparent to be incriminating "specifically by itself" about the ID that would warrant him to pick up the wallet, look through it, or seize it.

Detective Braden Bozer testified that he became involved in the investigation regarding Arnold when Detective Branum needed help securing the first search warrant. He also assisted in searching Arnold's shed. Detective Bozer then stated that based on the items he saw during the search, he obtained the second search warrant "specific[ally] for the electronics" in Arnold's shed and that, after he had obtained the second search warrant, he seized the physical computers and electronic devices.

On cross-examination, Detective Bozer acknowledged that the second search warrant was an evidentiary search warrant secured under Article 18.02(a)(10) of the Texas Code of Criminal Procedure. A copy of that search warrant was admitted in evidence without objection.

6

Arnold then testified. He recalled that on March 3, 2024, he did receive a visit by law enforcement officers who were looking for an iPhone. Arnold said that he then "grabbed all the iPhones" that he had. He testified that after he had helped the officers, they told him that they wanted to enter the outbuilding from which he had retrieved the iPhones. Arnold explained that he and his mother used the shed for storage and that he used it as an office. He also stated that it was "getting renovated" because they had had tenants living there in the past.

Arnold testified that he was asked for his consent to enter the shed "[l]ike four times" and that he denied consent "[e]very time except for the last time." As Arnold explained it, after he had denied consent the first few times, the officers then asked Arnold's mother for consent. Arnold stated that his mother showed Detective Branum the property line and "told them that they could search the property line" and that "she showed them a little bit inside of one of the other sheds on the property, and [Detective Branum] just poked his head in[ and] looked around just a second." However, Arnold claimed that his mother consistently denied consent to search the shed that he used as an office. Arnold averred that there was "a feeling of pressure to consent after [he] had already denied consent and the officers sought consent from other parties."[6] Arnold testified that, at some point, he did grant

---

[6]Although he used "officers" and "other parties" in the plural, Arnold testified that Detective Branum was the only officer present when consent was requested to search the shed. Arnold also testified that, at the time, he and his mother were the only two who were living at that property.

Detective Branum consent "to look for a cell phone, an iPhone." He further testified that there had been tenants living in the outbuilding in the past, that he also had people that regularly frequented the shed, and that it was possible that one of these many people had left an ID or other items behind.

On cross-examination, Arnold admitted that his mother gave Detective Branum consent to look around "[t]he property." He acknowledged that there was a meth pipe located in the shed. He also testified that there was no identifying information on the whiteboard and that the pouch with the ID observed by Detective Branum was inside a cubby hole in the desk.

## B. The Trial Court's Rulings

Arnold argued to the trial court that the consent that Detective Branum received "was limited to [searching for] a red iPhone." Arnold separately argued that his personal writings were seized in violation of Article 18.02(a)(10) of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 18.02(a)(10) ("A search warrant may be issued to search for and seize . . . property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense . . . ."). The trial court denied the motion to suppress "[o]n the first issue [of] the initial consent search or what [the parties were] calling a consent search" but reserved ruling on the

8

personal writings issue.[7]   Prior to trial, the trial court signed findings of fact and

conclusions of law.  Among its fact findings were the following:

> 8.      [Arnold's mother] owns the property [that was searched].
>
> 9.      [Arnold's mother] told Detective Branum he could search the property and outbuildings for the missing cell phone.
>
> 10.     Detective Branum asked [Arnold's mother] for permission to enter the shed Mr. Arnold had come in and out of.
>
> 11.     [Arnold's mother] gave Detective Branum permission to enter the shed but stated that Mr. Arnold used the shed as an office.
>
> 12.     Detective Branum asked Mr. Arnold for permission to enter the shed.
>
> 13.     Mr. Arnold gave Detective Branum permission to enter the shed.
>
> 14.     Mr. Arnold led Detective Branum into the shed.

The trial court concluded as a matter of law that Detective Branum received

consent from both Arnold's mother and Arnold himself "to enter the shed in which

contraband was discovered" and that "[t]he evidence was discovered pursuant to a

consensual search."

---

[7]After the jury trial commenced but before opening statements, the trial court held a hearing outside the presence of the jury solely on the issue "of whether the taking of the writings were valid under that warrant."  After hearing the arguments of counsel, the trial court denied Arnold's motion to suppress his personal writings that were seized, implicitly ruling that the items at issue were not personal writings. Arnold then asked for and was granted "a running objection to any of the evidence that is introduced that was pursuant to the search warrant, which came about because of . . . the illegal entry into the shed, which precipitated both the search of the shed and the house."  On appeal, Arnold abandoned his Article 18.02(a)(10) argument, and we therefore will not analyze it.

## III. DISCUSSION

In his first issue, Arnold argues that the trial court erred when it determined that the warrantless search of the shed was consensual. In his second issue, he argues that, if the search was consensual, then it was nonetheless improper because it went beyond the scope of his consent. And in his third issue, he argues that the two search warrants would not have been obtained if not for the illegal search and that therefore the trial court erred in allowing the evidence obtained from those warrants to be admitted.

### A. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281.

When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). We then review the trial court's legal ruling de novo unless its explicit fact findings that are

10

supported by the record are also dispositive of the legal ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

## B. Applicable Law

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. A defendant seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980); *State v. Martinez*, 569 S.W.3d 621, 623 (Tex. Crim. App. 2019). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable. *Martinez*, 569 S.W.3d at 623.

Whether a search is reasonable under the totality of the circumstances is a question that we review de novo. *Ornelas v. United States*, 517 U.S. 690, 696–99, 116 S. Ct. 1657, 1661–63 (1996); *Kothe v. State*, 152 S.W.3d 54, 62–63 (Tex. Crim. App. 2004). In the process, we must balance the public interest and the individual's right to be free from arbitrary detentions and intrusions. *Kothe*, 152 S.W.3d at 63. A warrantless search is per se unreasonable unless it falls within a recognized exception to the warrant requirement.[8] *State v. Garcia*, 569 S.W.3d 142, 148 (Tex. Crim. App.

---

[8]Article I, Section 9 of the Texas Constitution does not require that a search or seizure be authorized by a warrant; therefore, a search or seizure that is otherwise

11

2018). "One recognized exception is when a voluntary consent to search has been given." *Welch v. State*, 93 S.W.3d 50, 52–53 (Tex. Crim. App. 2002).

A person is free to limit the scope of the consent that he gives. *Valtierra v. State*, 310 S.W.3d 442, 449 (Tex. Crim. App. 2010). A "consent search" is a limited and conditional search only insofar as the consenting party has expressly stated or, under the "reasonable man" standard in the light of all the existing circumstances, is deemed in fact to have impliedly attached, certain limitations under which the officers are authorized by him to search. *Johnson v. State*, 226 S.W.3d 439, 446 n.30 (Tex. Crim. App. 2007) (quoting *State v. Koucoules*, 343 A.2d 860, 868 (Me. 1974)). "The character of the search is determined by the scope of the authorization as understood by reasonable men having knowledge of all the existing factual circumstances, and not by any limitational rule of law applicable to all consent searches." *Id.* Thus, "the standard for measuring the scope of consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803–04 (1991)).

"When the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require

_____

reasonable does not violate that provision simply because it was not authorized by a warrant. *Hulit v. State*, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998).

12

that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Reasor v. State*, 12 S.W.3d 813, 817–18 (Tex. Crim. App. 2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S. Ct. 2041, 2059 (1973)). The validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily.[9] *Gutierrez v. State*, 221 S.W.3d 680, 686–87 (Tex. Crim. App. 2007). Because issues of consent are necessarily fact-intensive, "a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous." *Meekins*, 340 S.W.3d at 460.

## C. Analysis

### 1. Arnold's first issue: the consent search of the shed[10]

---

[9]Although the federal constitution only requires the State to prove the voluntariness of consent by a preponderance of the evidence, the Texas Constitution requires the State to show by clear and convincing evidence that the consent was freely given. *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). If the record supports a finding by clear and convincing evidence that consent to search was free and voluntary, then we will not disturb that finding. *Id.*

[10]Before analyzing the trial court's ruling on the consent search of Arnold's shed, we pause to note that it is not clear that Arnold has preserved his first issue for our review. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Most complaints, "whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)." *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). Error is also forfeited when the complaint made on appeal does not comport with the complaint made in the trial court. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012).

Arnold's first issue has no merit. He relies on his testimony that he was asked four times for his consent to enter the shed before he granted it and argues, "Asking a person the same question multiple times until you get the answer you want is a coercive act." The Court of Criminal Appeals has said the exact opposite; "repeatedly asking for consent does not result in coercion, particularly when the person refuses to answer or is otherwise evasive in his response. . . . Indeed, there is indication from the Supreme Court that asking repeated questions or talking at a non-responsive, uncooperative suspect is not a coercive technique." *Meekins*, 340 S.W.3d at 464 (first citing *United States v. Pulvano,* 629 F.2d 1151, 1157 (5th Cir. 1980); and then citing *Berghuis v. Thompkins*, 560 U.S. 370, 386–87, 130 S. Ct. 2250, 2263 (2010)). In *Meekins*, an officer asked the appellant six times whether he would consent to a search of his car. 340 S.W.3d at 461. The appellant repeatedly stalled and evaded the question before finally saying, "Yes" or "I guess." *Id.* The *Meekins* Court upheld a trial court's finding that the appellant voluntarily consented to a search of his car. *Id.* at 465. Like the appellant in *Meekins*, Arnold "has presented no evidence of factors that would tend to show coercion, such as an officer's display of a weapon, threats, promises, deception, physical touching, or a demanding tone of voice or language." *Id.* at 464.

In the trial court, Arnold argued that "whenever it came to the consent that was given to enter the home, it was limited to a red iPhone." But in his first issue on appeal, he contends "that the search of his shed was unlawful because the consent he gave to Detective B[ranu]m was coerced." These complaints do not comport with one another. In an abundance of caution, however, we will address the merits of Arnold's first issue.

14

Besides that, the trial court found that Arnold's mother gave Detective Branum permission to enter the shed and told him that he "could search the property and outbuildings for the missing cell phone," and Arnold does not challenge this finding. Detective Branum testified that Arnold's mother gave him consent to search the property, including the shed.[11]  "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106, 126 S. Ct. 1515, 1518 (2006).  Therefore, the trial court did not err when it determined that Detective Branum's warrantless search of the shed was consensual.  We overrule Arnold's first issue.

## 2. Arnold's second issue: scope of consent

In his second issue, Arnold argues that if he gave consent to search the shed, then his consent was expressly limited in scope to search for a red iPhone and that "[o]nce Detective Branum entered the shed[,] his legal authority to search was limited to looking for a red iPhone[;] anything else was beyond the scope [of consent] allegedly granted by [Arnold]."  He thus contends that Detective Branum's picking up the wallet and flipping it over was improper and violated the "plain view" doctrine.

---

[11]In addition, Detective Branum stated in his affidavit that was admitted in evidence without objection at the hearing as part of Defendant's Exhibit 1, that Arnold's mother "provided consent to search the residence and buildings on the property."

The "plain view" doctrine requires that (1) law enforcement officials must lawfully be where the object can be plainly viewed, (2) the incriminating character of the object in plain view must be immediately apparent to the officials, and (3) the officials must have the right to access the object. *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009); *Walter v. State*, 28 S.W.3d 538, 541 (Tex. Crim. App. 2000). "Immediately apparent" has been defined to mean "without the necessity of any further search." *See State v. Dobbs*, 323 S.W.3d 184, 189 (Tex. Crim. App. 2010). Therefore, so long as probable cause to believe that items found in plain view constitute contraband arises while police are still lawfully on the premises, and any further investigation into the nature of those items does not entail an additional and unjustified search of—or unduly prolonged police presence on—the premises, the Fourth Amendment allows those items to be seized. *Id.* at 185.

Arnold claims that Detective Branum "admitted [at the hearing] that there was nothing about [the wallet with a badge holder clipped to it] that made it immediately apparent to be incriminating evidence,"[12] and therefore, "because it was not immediately apparent to Detective Branum that the wallet and badge holder w[ere] evidence[,] he was legally prohibited from picking [them] up and flipping [the wallet

---

[12]At the suppression hearing, when asked, "So whenever you picked up [this] ID, at that point, without . . . understanding whether or not it belonged to a past tenant, without understanding whether or not it belonged to a deceased person, someone under 18, this ID was just immediately apparent to you to be incriminating evidence?" Detective Branum testified, "Not immediately, no, sir."

16

and badge holder] over." The State counters that Arnold's point is moot. It contends that "Detective Branum received general consent from [Arnold's mother] to search the shed" and that "[s]he never placed any limitations on the scope or duration of the search." The State invites us to "infer a blanket consent to search the shed based on those circumstances[,] which permitted Detective Branum to investigate, even by picking up, the identification badge."

When viewed in the light most favorable to the trial court's ruling, the evidence supports a finding that Arnold's mother did not place any limitations on her consent for Detective Branum to enter and search the shed.[13] But even if both Arnold's and his mother's consent to enter and search the shed was limited to Detective Branum's searching for a red iPhone, Detective Branum did not exceed the scope of that consent by picking up and flipping over the wallet and attached badge holder. A reasonable person would have understood that, in searching the shed for the missing

---

[13]The trial court did not explicitly make this finding, but it conspicuously did not qualify its findings that Arnold's mother "told Detective Branum he could search the property and outbuildings for the missing cell phone," that Detective Branum received consent from both Arnold and his mother to enter the shed, and that the evidence that Arnold sought to suppress "was discovered pursuant to a consensual search." When the record is silent on the reasons for the trial court's ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we infer the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson*, 414 S.W.3d at 192; *Kelly*, 204 S.W.3d at 818–19.

iPhone, Detective Branum would pick up and move items within the shed.[14]  Indeed, it is reasonable to think that if Detective Branum was exceeding the scope of Arnold's or his mother's consent when he picked up the wallet and badge holder and flipped them over, then Arnold or his mother would have said something or otherwise let Detective Branum know that they had not consented to that action.  *See Meekins*, 340 S.W.3d at 463–64 ("Mere acquiescence may constitute a finding of consent.");

---

[14]Our sister court in Texarkana analyzed a similar scope-of-consent issue in *Flowers v. State*, 438 S.W.3d 96 (Tex. App.—Texarkana 2014, pet. ref'd).  A detective investigating a murder had asked Flowers, "[S]o do you mind if we go through your phone to get his [alibi witness's] number?" to which Flowers had replied, "Oh no, it's saved under 'T–Will.'"  *Id.* at 100.  But the police did not limit their search of the data on Flowers's cell phone to obtaining the alibi witness's telephone number; rather, they accessed, reviewed, and photographed Flowers's telephone call history as well.  *Id.*  At trial, Flowers objected to the introduction of certain anticipated evidence against him.  *Id.*  He argued that the scope of the permission he had given to the police regarding the data on his cell phone was limited to obtaining his alibi witness's telephone number and that the police exceeded the scope of the permission by reviewing  the phone calls made on that cell phone and photographing his call history list.  *Id.* at 100–01.  The trial court overruled Flowers's objections.  *Id.* at 101.

As our sister court explained,

> The expressed object of the search was to obtain [the alibi witness's] telephone number, and Flowers informed the police exactly where that could be found.  While an objectively reasonable person would not expect the search to involve all areas of the phone, an objectively reasonable person would expect the search might include either the contacts list, the call history list, or both such lists.  . . . The United States Supreme Court has emphasized that limitations imposed by the defendant in assenting to a request must be explicit.  *See Jimeno*, 500 U.S. at 251, 111 S. Ct. [at 1804].

*Id.* at 108–09.  Here, Arnold placed no explicit limitations on the consent that he gave Detective Branum to search the shed for the missing iPhone.

*Valtierra*, 310 S.W.3d at 449 (stating that "a person's silence in the face of an officer's further actions may imply consent to that further action"). The trial court could have inferred from Arnold's silence or acquiescence that Detective Branum was operating within the scope of the consent that Arnold and his mother had granted him when he picked up the wallet and badge holder and flipped them over. We overrule Arnold's second issue.

### 3. Arnold's third issue: his running objection

In his last issue, Arnold challenges the trial court's "overruling" of his running objection. We interpret this as a blanket challenge to the trial court's admission of all the evidence that was seized pursuant to the two search warrants. However, Arnold argues no separate ground for the inadmissibility of this evidence and makes no argument in his third issue that he did not make in his first two issues. Having overruled Arnold's first two issues, we overrule his duplicative third issue.

## IV. CONCLUSION

Having overruled all of Arnold's issues, we affirm the judgment of the trial court.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 11, 2025